# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-CA-00823-SCT

*GLORIA (GIGI) WRIGHT BRESNAHAN*

*v.*

*ROBERT JAMES BRESNAHAN*

| | |
|---|---|
| DATE OF JUDGMENT: | 1/27/2000 |
| TRIAL JUDGE: | HON. EDWARD G. CORTRIGHT, JR. |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | D. ELIZABETH FEATHERSTON |
| ATTORNEY FOR APPELLEE: | ROBERT D. JONES |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART- 05/02/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 5/23/2002 |

**BEFORE McRAE, P.J., EASLEY AND GRAVES, JJ.**

**McRAE, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Robert (Bob) James Bresnahan and Gloria (Gigi) Wright Bresnahan were granted a divorce on the grounds of irreconcilable differences, and the chancellor was to decide how the parties' assets should be distributed. The trial judge awarded Mr. Bresnahan fifty-five percent of what he determined to be the marital estate and ordered Mrs. Bresnahan to pay child support amounting to thirty-eight percent of her monthly income. Mrs. Bresnahan appeals and raises numerous allegations of error, most of which stem from the chancellor's determination and division of assets.

¶2. The judgment requiring Mrs. Bresnahan to pay child support is upheld. The chancellor did not abuse his discretion in determining what constituted marital assets and how those assets were to be distributed. The chancellor did not err by his refusal of a continuance. Finally, Mrs. Bresnahan should not be required to ask Mr. Bresnahan's permission before having overnight guests in the marital home. We affirm the chancellor's decisions as to these issues, with the exception of the last, which we reverse and render.

## FACTS

¶3. The parties were married in July of 1973. Mr. Bresnahan had recently graduated from law school and started his own practice. He has always been a sole practitioner and was, for many years, a prosecuting attorney for the City of Meridian. Mrs. Bresnahan, who did not graduate from college, worked in her husband's office for the first year of their marriage. She took about eighteen months off after their daughter was born and stayed home six or seven years after the couple's second child, who is now in college, was born. Mrs. Bresnahan provided health insurance for her family by working as a secretary during the rest of the marriage. She was laid off in February 1999 and was looking for new employment at the time of trial.

¶4. Mrs. Bresnahan filed for divorce on December 3, 1998. The Bresnahans agreed to an Amended Consent of Divorce on the Grounds of Irreconcilable Differences, in which Mr. Bresnahan acquired custody of the couple's son and Mrs. Bresnahan waived any right to alimony. The chancellor issued a judgment of divorce granting a divorce based on irreconcilable differences, separating marital assets from non-marital assets, effecting an equitable distribution of the marital assets and requiring Mrs. Bresnahan to pay $250 per month for her son's college education, support and maintenance and $154 per month for medical insurance for her son.

¶5. Gigi Bresnahan appeals and raises the following issues:

**I. Whether the chancellor abused his discretion in failing to grant a continuance where the defendant failed to produce financial records in a timely manner; failed to produce complete records; and ran his earnings and financial affairs through a maze of accounts, which deprived plaintiff of the opportunity to ascertain and present evidence concerning his earnings and earning capacity and disposition of a substantial sum of money during the separation of the parties.**

**II. Whether the chancellor erred in making an equitable division of the property between the parties by:**

**A) Improperly excluding two parcels of real estate acquired during the marriage, based upon the husband's uncorroborated assertion that he had used inherited funds as the source of down payments.**

**B) Improperly refusing to charge the husband with any portion of the funds, admittedly at least $111,000, which the husband had spent following the separation of the parties.**

**C) In otherwise failing to properly apply the criteria for equitable distribution.**

**III. Whether the chancellor erred in using outdated appraisals of jewelry that were for the full retail or replacement cost.**

**IV. Whether the chancellor abused his discretion in attaching conditions to the wife's temporary use of the marital home, requiring her to obtain written consent from the husband to rent or to have any unrelated male spend the night in any portion of the home.**

**V. Whether the chancellor abused his discretion in awarding child support amounting to 38% of the wife's adjusted gross income.**

## DISCUSSION

**I. Whether the chancellor abused his discretion in failing to grant a continuance where the defendant failed to produce financial records in a timely manner; failed to produce complete records; and ran his earnings and financial affairs through a maze of accounts, which deprived plaintiff of the opportunity to ascertain and present evidence concerning his earnings and earning capacity and disposition of a substantial sum of money during the separation of the parties.**

¶6. "The decision to grant or deny a continuance is within the sound discretion of the trial court. . . ." *Owens v. Thomae,* 759 So.2d 1117, 1120 (Miss. 1999); *Red Enters., Inc. v. Peashooter, Inc.,* 455 So.2d 793, 796 (Miss. 1984). Although Mr. Bresnahan was slow in providing his financial records, he did comply with the court's Opinion/Order of October 15, 1999. Both parties addressed this issue in their briefs, and as Mr. Bresnahan **did come forward** with the documents in question, we do not find the length of discovery to be a relevant reason for the chancellor to have granted a continuance. If Mrs. Bresnahan really believed that Mr. Bresnahan was not producing these records as a means to delay or obstruct the proceedings, then she should have requested a proper hearing before the chancellor when no documents were produced after she filed her second motion to compel. She could then have filed a motion for contempt when Mr. Bresnahan failed to either provide the documents or give an objection to providing them. Had Mrs. Bresnahan gone through the proper channels in the first place, she would have gotten all of the requested discovery materials in a more timely fashion and had plenty of time to review them before trial. Therefore, we do not find the chancellor's failure to grant a continuance to be erroneous.

**II. Whether the chancellor erred in making an equitable division of the property between the parties by:**

**A) Improperly excluding two parcels of real estate acquired during the marriage, based upon the husband's uncorroborated assertion that he had used inherited funds as the source of down payments.**

¶7. The Bresnahans lived in a house that Bob inherited when his parents died. They also had three parcels of rental property, all of which were bought after the couple married. One rental house was titled to both Bob and Gigi. The other two were titled in only Bob's name, and he claimed to have purchased them with inherited funds, thus making them non-marital assets.

¶8. It is uncontroverted that the two rental houses in question were bought with non-marital assets ( Bob's inherited funds). The issue is whether income from the houses was co-mingled with other assets so as to make the income, and thus the houses, marital property. Gigi cites *Tillman v. Tillman,* 716 So.2d 1090 (Miss. 1998) and *Johnson v. Johnson,* 650 So.2d 1281 (Miss. 1994) in which non-marital property (inheritance) became a marital asset because it was used to pay normal marital expenses and became inseparable from the couples' joint income and other marital assets. In this case, there is no evidence that Bob paid any of the family's expenses out of the Bresnahan Properties' account, although he did put the rent monies received from the non-marital properties into an account which also held income from the marital properties. He paid for improvements and upkeep on all of the properties out of this account. This co-mingling of rent from the various rental properties does not rise to the level of commingling in *Tillman* or *Johnson*. Therefore, the chancellor's decision to exclude these two parcels of real estate from the marital property subject to equitable division was not in error.

**B) Improperly refusing to charge the husband with any portion of the funds, admittedly at**

**least $111,000, which the husband had spent following the separation of the parties.**

¶9. In *Ferguson v. Ferguson*, 639 So.2d 921, 928-29 (Miss. 1994), this Court determined several factors to be assessed in making an equitable division of marital property. One of these factors is "[t]he degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise." The Bresnahans had a joint investment account, the balance of which fluctuated according to the stock market. This account contained $ 91, 062.07 at the time of the separation and had been emptied and closed as of the date of trial. In less than a year, Bob spent approximately $115,346.66 from this account. It is uncontested that Bob disposed of these funds after the parties separated. Gigi claims that at least some of these funds should have been credited against her husband's share of marital property subject to equitable distribution. The chancellor disagreed because he did not think Bob's expenditures were "wasteful."

¶10. Bob testified at the temporary hearing that this particular account was created as a place to save money for the payment of income taxes, the children's college costs and sometimes business expenses. Bob also explained the purpose for which each payment out of the account was made. Both the chancellor and Gigi had financial information and bank statements for this account. Gigi's argument on this issue is not supported by authority, either through evidence or case law; and therefore, we do not consider it. *Bower v. Bower,* 758 So.2d 405, 415 (Miss. 2000)(citing *Hankins v. Hankins,* 729 So.2d 1283, 1286 (Miss. 1999)). We, therefore, uphold the finding of the chancellor with regard to the money from this account as it was based on substantial evidence in the record.

**C) In otherwise failing to properly apply the criteria for equitable distribution.**

¶11. One must remember that an equitable division of property does not always mean an **equal division** of property. Mississippi is not a community property state. *Chamblee v. Chamblee,* 637 So.2d 850, 863-64 (Miss. 1994); *Dillon v. Dillon,* 498 So.2d 328, 330 (Miss.1986); *Rives v. Rives,* 416 So.2d 653, 657 (Miss.1982). The community property system and Mississippi's system of equitable division are very dissimilar. In a community property state, the court may not look at the background of the marriage and/or the behavior of the married couple to decide what would constitute a just distribution of property. The law mandates an even division of all marital property and liability, regardless of each parties' respective contributions.

¶12. Under the system of equitable division, the courts in Mississippi are not so inhibited. "The matter rather is committed to the discretion and conscience of the Court, having in mind all of the equities and other relevant facts and circumstances." *Chamblee,* 637 So.2d at 864 (citing *Brown v. Brown,* 574 So.2d 688, 691 (Miss.1990)). These cases show that the findings of the chancellor in this area are quite liberally construed. The chancery court is authorized to call for an equitable division of jointly accumulated property and in doing so to look behind the formal state of title. *See, e.g., Jones v. Jones,* 532 So.2d 574, 579-81 (Miss.1988); *Regan v. Regan,* 507 So.2d 54, 56 (Miss.1987) *overruled on other grounds*, *Tramel v. Tramel*, 740 So.2d 286 (Miss. 1999); *Watts v. Watts,* 466 So.2d 889, 890-91 (Miss.1985). *Ferguson,* 639 So.2d at 928-29, set forth the factors to be weighed in determining an equitable division of marital property.

¶13. A main consideration in a proper division of property is the economic contributions made by each party to the marriage, both in terms of actual money earned and in terms of service without compensation such as domestic duties. *Regan,* 507 So.2d at 56; *Pickle v. Pickle,* 476 So.2d 32, 34 (Miss.1985). The

case at bar features a couple who have each, over their twenty plus years of marriage, donated money and/or non-compensated time to the marriage. Other than Gigi taking time off to raise the children, both had worked for the majority of the marriage. Admittedly, Bob contributed the most monitarily, but it is also apparent, though disputed, that both parties contributed various amounts of non- paid services such as child care and domestic work to the marriage as well.

¶14. In his opinion, the chancellor addressed each of the *Ferguson* factors in turn and found that based on the information before him, Bob was due a majority of the parties' assets. The decision of the chancellor to award Bob what amounts to fifty-five percent of the marital assets, leaving Gigi with the remaining forty-five percent is not unreasonable,[1] and as such, we uphold that decision.

### III. Whether the chancellor erred in using outdated appraisals of jewelry that were for the full retail or replacement cost.

¶15. In determining the value of Gigi's jewelry and furs, the chancellor accepted appraisals submitted by Bob. Some of these appraisals are from as long ago as 1980. Gigi objected to the chancellor's reliance upon these outdated figures.

¶16. An appellate court may remand a case to the chancellor for re-evaluation when appraisals of value of disputed items are either out of date or untrustworthy. *Carrow v. Carrow,* 642 So.2d 901, 907-08 (Miss. 1994); *King v. King,* 760 So.2d 830, 836 (Miss. Ct. App. 2000). Of the twenty-five appraisals submitted by Bob, eleven (constituting over $24,000) were made anywhere from ten to nineteen years before trial. Bob claimed that the appraisal of one of his properties was too high and Gigi believes the jewelry appraisals are inflated. The chancellor decided to accept the appraisals given to these items in both cases because he "suspect[s]" they "balance[] out each party's claim." We find that this rationale, in conjunction with the fact that Gigi did not submit any evidence to bolster her claims, supports the chancellor's finding of fact. The trial court's holding regarding this issue is hereby affirmed.

### IV. Whether the chancellor abused his discretion in attaching conditions to the wife's temporary use of the marital home, requiring her to obtain written consent from the husband to rent or to have any unrelated male spend the night in any portion of the home.

¶17. The chancellor's decision to allow Bob approval rights regarding rental of the marital home seems logical. Gigi will live in the house for only a few years, while Bob is still the owner and as such has a vested interest in the type of tenant living in the house. To give Gigi unfettered discretion as to who is permitted to rent the other side of the house could also subject her to liability should the tenant damage the property. The chancellor's finding as to Bob's right of tenant approval is upheld.

¶18. The chancellor did err by requiring Gigi to obtain Bob's written consent before allowing an unrelated male to spend the night in her home. While Gigi's use of the marital home may be seen as akin to alimony, this restriction is unreasonable. There can be many situations involving overnight guests which do not rise to the level of cohabitation, and a constraint such as this impinges upon Gigi's ability to live her life as a single adult. We, therefore, reverse and render as to the issue of overnight company.

### V. Whether the chancellor abused his discretion in awarding child support amounting to 38% of the wife's adjusted gross income.

¶19. Miss. Code Ann. § 43-19-101(2000) gives only a guideline regarding the amount of child support

payments. This statute does not take into account any specific or individual needs; the chancellor must determine this after being informed of the particular facts and needs of the parties involved. *Gillespie v. Gillespie,* 594 So.2d 620 (Miss. 1992); *Thurman v. Thurman,* 559 So.2d 1014 (Miss. 1990). Child support amounting to greater than fourteen percent of the payer's income has been upheld on numerous occasions. *Grant v. Grant,* 765 So.2d 1263 (Miss. 2000); *Smith v. Smith,* 614 So.2d 394 (Miss. 1993); *McEachern v. McEachern,* 605 So.2d 809 (Miss. 1992). In *Dufour v. Dufour,* 631 So.2d 192 (Miss. 1994), a child support award in excess of the statutory guidelines was reversed only because the chancellor failed to make a specific finding as to the father's income and the final decree did not specify the basis for the child support award.

¶20. The chancellor in the present case detailed his reasons for ordering Gigi to pay child support in his opinion which was included as an exhibit to the judgment of divorce. It was noted in the opinion that Gigi's monthly adjusted gross income was $1,056.84 and that in light of the other assets available to her ($302, 415.50/ marital & $127,530.25/non-marital), her child support payments would be more than the statutory guideline of fourteen percent. Bob earns more money than Gigi and he also expects to bear the bulk of their son's educational expenses. However, since neither party can afford to pay for all of their son's education and they are apparently unwilling to send him to college without a car or to make him work, each should bear some of the expense incurred in sending their son to college.

¶21. It is also important to remember that Gigi's child support payments of $250 per month end upon her son's 21st birthday. Paul Bresnahan was 18 in 1999, at the time of trial. Paying this amount of child support for 3 years should not deplete or otherwise jeopardize Gigi's assets. Additionally, the chancellor said that if she can get cheaper insurance for her son through her job, it is fine for her to do so. This Court agrees with the chancellor's ruling as regards the amount of child support Gigi is responsible for paying.

## CONCLUSION

¶22. Gigi asserted that many errors were made by the chancellor in this case. In reviewing the record, it is clear that only one of her allegations is meritorious. It was improper for the chancellor to require Gigi to get Bob's permission before having overnight, male guests. The judgment is reversed and rendered as to the visitation issue subject to the findings above. We affirm the chancellor's judgment as to all other issues.

¶23. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**SMITH, P.J., WALLER, DIAZ, EASLEY AND GRAVES, JJ., CONCUR. CARLSON, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. COBB, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY PITTMAN, C.J., CARLSON, J., JOINS IN PART.**

**COBB, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶24. Although the chancellor is to be commended for his clearly written, very detailed, twenty-six page opinion, in which he addressed each of the *Ferguson* factors, I believe that he lost sight of the reality of the condition in which his distribution leaves Gigi. Therefore, I must respectfully dissent on the equitable distribution issue.

¶25. The facts in this case reveal a large number of similarities between the Bresnahans in the present case,

and the Fergusons in the landmark case which set the standard for equitable distribution of assets in Mississippi jurisprudence. The Bresnahans had been married 25 years; the Fergusons, 24 years. Bob was 51 years of age and Gigi, 47 years. Mr. and Mrs. Ferguson were 48 years and 44 years, respectively. The Bresnahans had two children, one already emancipated. The same was true of the Fergusons. Bob, an attorney of 26 years, was clearly the primary breadwinner of the family, as was Mr. Ferguson, a Bell Telephone Company cable installation and maintenance technician of 24 years. Both Gigi and Mrs. Ferguson were homemakers who also worked at least part time in relatively low income jobs, Gigi as a secretary and Mrs. Ferguson as a cosmetologist/beautician. In both cases, the wife initially filed for divorce on the grounds of adultery.

¶26. There are a number of differences, of course, but the most noticeable is the difference in what the chancellor in *Ferguson* found to be equitable distribution and what the chancellor here found to be equitable distribution. Because I believe that the chancellor looked too closely at percentages and totals, and overlooked the practical inequity of his decision, I would reverse and remand for a revision of the distribution of assets.

¶27. Acknowledging that our scope of review in domestic relations matters is limited, this is a very "close call". This Court will not disturb the findings of the chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied. *Ferguson v. Ferguson*, 639 So. 2d 921, 930 (Miss. 1994) (citing *Bell v. Parker*, 563 So. 2d 594, 596-97 (Miss. 1990))

¶28. Even though Gigi's original complaint sought a fault-based divorce, she and her husband later filed an amended consent to divorce on the ground of irreconcilable differences. In this amended consent, Gigi waived any right to alimony, of any kind. This becomes very significant, because it removes the opportunity for the chancellor to consider alimony and equitable distribution in tandem, and to apply the maxim "where one expands, the other must recede." *Ferguson,* 639 So.2d at 929. Although I believe it would be proper for the chancellor to apply this maxim in reverse to reach an equitable result, i.e. "where the one recedes, the other must expand", that issue was not raised and thus is not before us.

¶29. The only contested issues left to the chancellor were: valuing and classifying the assets as to marital or separate; equitably dividing the marital assets; and determining their son's support, maintenance, and college expenses.

### A. Equitable Distribution.

¶30. After classifying the assets, the chancellor divided the marital assets between their respective estates. Gigi's share of the marital assets were valued at $302,415.50. At first glance this looks like a significant sum. However, it is important to remember that Mrs. Bresnahan is now 50 years old, does not receive any alimony, and does not have a college degree or any specific skills which will enable her to support herself anywhere near the manner to which she is accustomed. Thus it will quite likely be necessary for her to liquidate many of the assets, possibly for a much lower amount than the value included in the calculation, just "to make ends meet." Included in her marital assets were $83,272 in jewelry and furs; $57,882 in personal property in the marital home; $8,361 in Hummel and Christmas Village items; and $73,500 in retirement accounts. The only income producing and/or liquid assets awarded to her were a rental house valued at $45,000; $17,000 in World Com stock; and $13,000 in a Trustmark investment account. She also was awarded the 10-year-old Cadillac, her only vehicle, valued then at $4,000. There is hardly sufficient "real" value in all the above on which to live.

¶31. Bob's share of the marital assets was $370,313, and included: the marital home valued at $90,000; the Meechan property valued at $37,500; his law office building valued at $69,000; retirement accounts valued at $72,500; investment accounts valued at $23,082; and personal property valued at $65,521. And he also was awarded the then 4 year old Four Runner and a 13 year old Nissan truck, total value of $12,000. The chancellor estimated this distribution gave Bob 55% of the marital assets and Gigi with 45%. It is well established that equitable distribution does not require equal distribution. But here, not only was Gigi awarded $68,000 less in total value, but also the lack of "practical value" of the assets, in so far as they might be converted into cash on which to live, makes the gap even wider. I believe it is sufficiently wide to warrant reversing on this issue.

¶32. The chancellor also listed and valued the Bresnahans' separate non-marital assets, not subject to equitable distribution. Bob's separate assets were valued at $191,462 which included two rental homes. Gigi's separate assets were valued at $127,530 which included a one-half interest in a home in Gulfport she had inherited. This is a 60%-40% ratio. Again, this is a significant disparity.

¶33. After adding the totals of their respective estates after the distribution ordered by the chancellor, Bob's estate is approximately $130,000 larger than Gigi's. In addition he has been a practicing attorney for almost 30 years, with a far greater income potential than Gigi. This is inequitable, on its face and in practical application. In fact, it appears to be just the kind of inequitable situation which *Ferguson* and its progeny were intended to correct.

¶34. The last time the couple filed a joint tax return, for the 1997 tax year, their combined income was over $110,000. Of that total, Bob's income was nearly $90,000, including approximately $21,000 in wages, with the remainder from rental income and investments. Gigi's income was $23,479, of which approximately $15,000 was wages, with the remainder from investments. At the time of the divorce, she was laid off from her job and was receiving unemployment compensation of approximately $700 per month.

¶35. In *Ferguson v. Ferguson*, 639 So.2d 921, 934 (Miss. 1994), we said, "it must be remembered, the goal in a divorce case is to do equity." The disparity between the Bresnahans' respective separate estates, the disparity of their current incomes, and future potential incomes indicate that the chancellor erred in his distribution. Even though he found Mr. Bresnahan had contributed far more to amassing the estate, and Mrs. Bresnahan had shown herself to be a poor steward in managing her own funds since the separation, the chancellor crossed the thin line between equitable and inequitable distribution.

> ### B. Child Support.

¶36. At the time of the divorce, Gigi was unemployed, receiving unemployment benefits of $756.80, and rental income of $300 per month. Prior to being laid off, she had worked as a secretary making around $15,000 per year. As previously mentioned, the parties agreed that Bob would have legal and physical custody of their son.

¶37. The chancellor noted that, pursuant to the guidelines established by Miss. Code Ann. § 43-19-101 (2000), Gigi would only be required to pay 14% of her income, or around $147.95 per month. However, he found this to be an inadequate contribution considering the value of her assets, after distribution. He found the size of her assets sufficient to overcome the presumption as to the justness of the guidelines. The chancellor ordered Gigi to pay $250 per month toward her son's college education, support and

maintenance, while he was in college, but not past his 21ˢᵗ birthday. The chancellor further ordered her to pay $154 per month towards her son's medical expenses, in lieu of providing medical insurance for him through her work. She argues that child support of 36.5% is unreasonable and an abuse of discretion. Under ordinary circumstances, I would agree. However, because the amount was only for three years, maximum, the total amount can not exceed $15,000. This is not an unreasonable amount for her to contribute to her son's education. Thus, the chancellor did not abuse his discretion as to this issue.

¶38. Because I believe that the chancellor erred with regard to the equitable distribution of assets, I would reverse and remand for recalculation, consistent with this opinion. Thus I respectfully concur in part and dissent in part.

**PITTMAN, C.J., JOINS THIS OPINION. CARLSON, J., JOINS THIS OPINION IN PART.**

1. Justice Cobb in her dissent appears to go against the proper interpretation of *equitable* distribution and call for an *equal* distribution of the parties' assets. *See **Pierce v. Pierce,*** 648 So.2d 523, 526 (Miss.1994), in which we held that divorcing parties also have no right to equal distribution even where the parties jointly accumulated the property.